605 S.E.2d 509

**In the Matter of Frank Bryant BROWN, Respondent.**

**No. 25895.**

Supreme Court of South Carolina.

Submitted Sept. 23, 2004.

Decided Nov. 8, 2004.

Henry B. Richardson, Jr., Disciplinary Counsel, and Barbara M. Seymour, Senior Assistant Disciplinary Counsel, both of Columbia, for the Office of Disciplinary Counsel.

Desa A. Ballard, of West Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into two Agreements for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the first agreement, respondent admits misconduct and consents to the imposition of any sanction up to and including a two year definite suspension from the practice of law. *See* Rule 7, RLDE, Rule 413, SCACR. We accept the first agreement and impose a definite suspension of two years from the practice of law. In the second agreement, respondent admits misconduct and consents to the imposition of any sanction set forth in Rule 7(b), RLDE. We accept the second agreement and disbar respondent. The two sanctions shall run concurrently.

## FIRST AGREEMENT

The facts, as set forth in the first agreement, are as follows.

### FACTS

#### Matter I

■ Respondent graduated from law school in June 1999. Before being admitted to practice law in any state, respondent obtained employment with Brock & Scott, a Winston–Salem, North Carolina-based real estate firm. He was assigned to the firm's law office in Rock Hill. Respondent worked under the supervision of an attorney licensed to practice law in South Carolina.

While employed as a non-lawyer at Brock & Scott, respondent conducted real estate closings without an attorney being present. Respondent signed his own name to the documents associated with the real estate closings. After conducting the closings, it was respondent's practice to have other employees of the firm sign as witness and/or notary on the documents

even though they were not present at the closings. Respondent conducted some closings when there was no licensed South Carolina attorney on the premises. Respondent routinely signed as witness and notary to documents relating to closings at which he was not present.

In September 1999, Brock & Scott merged with the firm of Forquer & Green, a Charlotte, North Carolina-based real estate firm with an office in Columbia, The two firms remained separate in North Carolina, but operated as Green, Brock, Forquer & Scott in South Carolina. Respondent continued to conduct real estate closings without an attorney present (and sometimes without an attorney on the premises) while employed by the new firm. In connection with those real estate closings, respondent signed the name of his supervising attorney without indicating he was signing on her behalf. He continued his practice of soliciting signatures and notarizations from staff members not present at the closings and signing his own name as witness and notary to documents executed outside his presence.

In January 2000, the South Carolina attorney responsible for respondent's supervision left Green, Brock, Forquer & Scott to work for a subsidiary company of Forquer & Green in Charlotte. Respondent continued to conduct real estate loan closings without the presence or supervision of a South Carolina attorney. Respondent continued to sign his former supervising attorney's name to real estate documents.

In April 2000, Green, Brock, Forquer & Scott dissolved and respondent became employed with Forquer & Green. He continued to conduct real estate closings in the manner described above until his admission to the South Carolina Bar in November 2000.

Respondent estimates he conducted two or three closings per day from June 1999 until November 2000. During the time period in which respondent conducted closings for the three law firms, it was not his practice to inform parties he was not an attorney. While he did not affirmatively hold himself out as an attorney, respondent only disclosed the fact that he was not an attorney when a party made a specific inquiry. Respondent acknowledges that it was likely that the parties to the closings assumed he was an attorney.

During the time period in which respondent was conducting the closings for the three law firms, he made no meaningful inquiry about the propriety of a nonlawyer conducting real estate closings, although he represents he did have concerns in this regard. Respondent did not question his employers, conduct research into the statutory or case law on the subject, consult with an attorney outside the firm, or seek guidance from the South Carolina Bar.

## Matter II

On January 28, 2000, respondent traveled to the office of a mortgage company in Greenville to conduct a real estate closing for Mr. and Mrs. Doe. Respondent was not licensed to practice law at the time. There was no licensed attorney present at the closing or on the premises. Many of the closing documents were signed by the Does in blank. Respondent signed his supervising attorney's name to the closing documents. He returned the closing documents to the firm and solicited signatures of other staff members as witnesses and notary. Respondent's involvement in this matter was discovered during an investigation of a grievance filed after the Does attempted to refinance the property and discovered that that mortgage and deed had never been filed.

## Matter III

On February 25, 2000, respondent's former supervisor at Green, Brock, Forquer & Scott conducted a real estate closing for Mr. and Mrs. Smith as a favor to the firm because respondent was studying for the bar examination and unavailable. Respondent was unaware of this arrangement.

Upon his return to the firm after taking the examination, respondent found a stack of approximately ten to twenty closing files, including the Smiths' file, waiting for him to complete. Respondent proceeded to sign his former supervisor's name to the closing documents in those files. He was unaware that his former supervisor had actually conducted the Smiths' closing. He assumed a paralegal had conducted the Smiths' closing. Respondent signed his own name as witness and/or notary on the documents in the files, including the documents in the Smiths' file, although he was not present

when the documents were executed. Some of the documents in the Smiths' closing file were incomplete or contained blanks. Respondent completed the documents or filled in the blanks. Respondent's involvement in the matter was discovered during an investigation of a grievance filed after the Smiths attempted to refinance the property and discovered that the mortgage and deed had never been filed.

## Matter IV

On April 26, 2000, while working as a non-lawyer for Forquer & Green, respondent was sent to a mortgage company in Greenville to conduct a closing for Mrs. Jones. At this time, respondent was being supervised by a different South Carolina attorney who was not available to conduct the closing himself. Although he was unaware of the circumstances at the time, respondent now reports that, in accordance with pleadings filed in ensuing litigation, they are as follows.

Mrs. Jones contacted the mortgage company about refinancing her home because she faced foreclosure. As a result of delays by the mortgage company, Mrs. Jones' home was sold at a foreclosure sale. Mr. Pressley, an employee of the mortgage company, purchased the home at the foreclosure sale. Mr. Pressley also persuaded Mrs. Jones to endorse the check for her portion of the sales proceeds to himself. For some reason, no deed was recorded by the special referee. At Mr. Pressley's request, respondent's firm prepared a deed from Mrs. Jones to Mr. Pressley.

Upon his arrival at the mortgage company, respondent was handed the above-mentioned deed and was informed that Mrs. Jones had signed the deed, but had left before he arrived. Respondent returned to the law office and signed his supervising attorney's name as witness and his own name as notary. Neither respondent nor his supervising attorney were present during the execution of the documents. Respondent did not confirm with Mrs. Jones that she had in fact signed the deed.

Ultimately, Mr. Pressley defaulted on the property and the home was sold at a second foreclosure. In settlement of the lawsuit filed against respondent, his supervising attorney, and Forquer & Green, the firm arranged for financing for Mrs.

Jones, placed title to the property back in her name, and paid her a cash settlement.

## Matter V

Respondent continued his employment with Forquer & Green following his admission to the South Carolina Bar in November 2000. He became a partner in the firm in April 2001.

After becoming a licensed attorney, respondent allowed non-lawyers under his supervision to conduct real estate closings outside his presence. During that time, respondent also continued the practices of witnessing and notarizing documents that were executed outside his presence and soliciting witness and notary signatures from individuals in the firm not present during execution. These practices continued until early in January 2002, when respondent received notice of grievances filed against him. Respondent has now discontinued these practices and has instructed the members and staff of his firm to discontinue these practices.

## LAW

Respondent admits that his misconduct constitutes grounds for discipline under Rule 413, RLDE, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers) and Rule 7(a)(5) (lawyer shall not engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law). In addition, respondent admits he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 5.3 (lawyer having direct supervisory authority over non-lawyer employee shall make reasonable efforts to ensure that the persons conduct is compatible with the professional obligations of the lawyer; lawyer is responsible for conduct of non-lawyer employee if the conduct would be a violation of the Rules of Professional Conduct if engaged in by a lawyer and lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved); Rule 5.5 (lawyer shall not assist non-lawyer in performance of activity

which constitutes unauthorized practice of law); Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); Rule 8.4(d) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice).

We note that a significant portion of respondent's misconduct, including conducting real estate closings, signing documents on behalf of others without so indicating, and requesting others sign as witness or notary on documents not signed in their presence, occurred before respondent was licensed to practice law in this state. We take this opportunity to address the Court's authority to discipline an attorney for conduct which occurred prior to, but was not discovered until after, his or her admission to the practice of law.[1]

The South Carolina Constitution specifies that this Court has jurisdiction "over the admission to practice law and the discipline of persons admitted." S.C. Const. art. V, § 4. The "central purpose of the disciplinary process is to protect the public from unscrupulous and indifferent lawyers." *Matter of Hall*, 333 S.C. 247, 251, 509 S.E.2d 266, 268 (1998); *Matter of Brooks*, 324 S.C. 105, 477 S.E.2d 98 (1996) (primary purpose of lawyer discipline is to maintain integrity of courts and protect the public). In order to maintain the public's trust, the Court possesses the authority to discipline attorneys for misconduct related to the legal profession and for misconduct which occurs outside the legal profession.[2] For the

---

1. It is a violation of the Rules of Professional Conduct for an applicant for admission to the bar to knowingly make a false statement of material fact in connection with the application process. Rule 8.1 of Rule 407, SCACR. In addition, the Rules Pertaining to the Admission to Practice Law advise the Court may vacate the admission or otherwise discipline an attorney if it is determined he provided false or misleading information in his application. Rule 402(h), SCACR. These rules are not directly applicable to the circumstances presented here as respondent's misconduct was not specifically addressed in the admissions process. However, they suggest the Court can sanction an attorney for misconduct which occurs prior to admission.

2. *See* Preamble to Rules of Professional Conduct, Rule 407, SCACR (lawyer's conduct should conform to the requirements of the law, both

purpose of protecting the public's trust in the legal system it is likewise the Court's duty to discipline an attorney for misconduct which precedes his or her admission to the practice of law. *See Stratmore v. State Bar of California,* 14 Cal.3d 887, 123 Cal.Rptr. 101, 538 P.2d 229 (1975); *Kentucky Bar Assoc. v. Signer,* 533 S.W.2d 534 (Ky.1976); *Matter of Wong,* 275 A.D.2d 1, 710 N.Y.S.2d 57 (N.Y.App.Div.2000); *see also Office of Disciplinary Counsel v. Zdrok,* 538 Pa. 41, 645 A.2d 830 (1994) (attorney disciplined for conduct which occurred before becoming member of bar did not violate constitutional prohibition against ex post facto laws).[3]

Practically speaking, had the Court known of respondent's misconduct prior to his admission, the information could have affected his admission to the Bar. Respondent's ability to keep relevant information from the Court until after his admission should not leave the Court without any means to address the situation.

By holding the Court has the authority to discipline an attorney for misconduct which occurred prior to admission, we do not suggest attorneys will be or should be disciplined for any and all pre-admission misconduct. Instead, the Court will consider the nature and severity of the misconduct along with its date in relation to the attorney's admission.

Here, respondent's misconduct occurred after his graduation from law school, while he was preparing to sit for and awaiting the results of the bar examination, and while he was working for a law firm. Respondent candidly admits he allowed firm clients to assume he was a licensed attorney. This Court cannot ignore the fact that, within months prior to his admission to the South Carolina Bar, respondent actively participated in the unauthorized practice of law. The Court concludes respondent is subject to the disciplinary authority of this Court for this misconduct.

---

in professional service to clients and in the lawyer's business and personal affairs).

**3.** In *Matter of Edwards,* 327 S.C. 148, 488 S.E.2d 864 (1997), the Court stated conduct occurring prior to an attorney's admission to the Bar is not sanctionable. To the extent *Edwards* is inconsistent with this opinion, it is overruled.

We accept the first agreement and impose a definite suspension of two years from the practice of law.

## SECOND AGREEMENT

The facts, as set forth· in the second agreement, are as follows.

### FACTS

#### Matter I

From June 2001 through May 2002 when he worked for the Rock Hill subsidiary of Forquer, Lattimore & Calloway (f/k/a Forquer & Green and f/k/a Green, Brock, Forquer & Scott), respondent conducted real estate closings on behalf of two real estate investment companies, Kenbill Properties (Kenbill) and Keystone Properties (Keystone). Respondent became involved with these real estate investment companies less than a year after his admission to the Bar. Although he was made a partner in the firm, he was provided no training or supervision by Mr. Green or Mr. Forquer, the senior partners in the firm, neither of whom was licensed in South Carolina.

Kenbill Properties (Kenbill) and Keystone Properties (Keystone) were in the business of locating properties and finding borrowers/investors to purchase the properties. The borrowers/investors were told they needed no down payment and would actually be paid money to purchase· homes. The real estate investment companies promised to locate renters and manage the properties. They agreed to collect rent, pay the mortgage and upkeep, retain a fee, and then pay the balance to the borrowers/investors.

The seller (usually the builder) established a sales price for the property. The real estate investment companies, with the assistance of a mortgage broker or loan officer, then prepared a sales contract, loan application, and other documents containing an inflated sales price (approximately $15,000 to $100,00 above the actual sales price), down payment amount, and false information about the borrower/investor. The documents were presented to and approved by a lender.

Thereafter, respondent would complete a title search, a title commitment, and a HUD–1 settlement statement. The HUD–1 prepared by respondent would reflect the inflated sales price, a down payment from the borrower/investor, and a cash payment to seller. At closing, the HUD–1 would be signed by the borrower/investor, the seller, and respondent. The parties would also sign a certification that the information on the HUD–1 was a true and accurate representation of the receipts and disbursements in the transaction. Instead of disbursing the cash to seller as stated in the HUD–1, respondent would pay a portion to the real estate investment company as an assignment or consulting fee and pay the balance to the seller. The borrower/investor would then be paid a fee outside the closing by the seller or the real estate investment company.

In some cases, the borrower/investor would not bring any cash to the closing, contrary to the representation made on the HUD–1. The only funds received by respondent were the loan proceeds which would be disbursed according to the assignment agreement between the real estate investment company and the seller, rather than in accordance with the HUD–1.

In cases where the lender required proof of certified funds from the borrower, the real estate investment company would purchase a cashier's check to bring to the closing (implying the check was provided by the borrower). In those cases, respondent would deposit the cashier's check and would add that amount back to the assignment fee check paid to the real estate investment company.

While respondent did not participate in the preparation of the fraudulent contracts or loan applications, he was responsible for preparing the fraudulent HUD–1 forms. He did so with knowledge that no cash would be received from the borrower/investor and that loan proceeds would not be disbursed as stated. With each loan package, respondent received a set of closing instructions. Those instructions specifically required respondent to verify that the HUD–1 settlement statement was a true and accurate accounting of the transaction. In many cases, respondent was instructed not to proceed with the transaction if he became aware of any payments to or contributions from any third parties not identified on the HUD–1.

Many of the borrowers/investors received lower interest rates because it was represented to the lenders that they intended to occupy the properties as primary residences. This representation was made on the loan applications and on affidavits and certifications contained in the loan packages required by the lender. These representations were false. Additionally, the mortgage securing the lender's interest in the property contained an occupancy clause, violation of which would render the borrower in default. While respondent did not prepare the loan applications, owner occupancy affidavits, or mortgages, he did present them to the borrowers for signature at the closings. While respondent did not have specific knowledge that the borrowers did not intend to occupy the properties, he was aware of the nature of Kenbill's and Keystone's businesses and he had sufficient facts that should have caused him to question the legitimacy of the transactions.

## Matter II

On at least eight occasions, respondent conducted concurrent real estate transactions on the same property for Kenbill and others. These transactions are sometimes referred to as either a property "flip" or loan "flip."

In an illegal property flip, the seller enters into a sales contract with Buyer A. Prior to the commencement of that sale, Buyer A enters into a contract to sell the same property at a higher price to Buyer B. Buyer B uses this contract to obtain financing. Buyer A obtains no financing. The conveyances are then made concurrently, with Buyer A using the loan proceeds obtained by Buyer B to purchase the property from Seller. The flip transaction is illegal when the information to the lender, including the information stated on the HUD–1 settlement statement, fails to disclose that the property is being conveyed in two transactions. Often documents have to be pre-dated or post-dated to mislead the lender. Title commitments, seller's affidavits or confirmations, and closing attorney certifications must contain false information. Often, neither Seller nor Buyer B is aware of the other's involvement. In those cases, Buyer A retains the excess loan proceeds. Buyer B then has a loan on the property that far exceeds the property value. In other cases, Buyer B is in collusion with Buyer A and they share the excess loan pro-

ceeds and leave the lender with property insufficient to cover its loan.

The cooperation of the closing agent is necessary for an illegal property flip to succeed. First, the title search required by the lender will reveal that the Seller owns the property rather than Buyer A (the party the lender believes is the seller). Second, the closing agent must actually close the Buyer A to Buyer B transaction first in order to fund the Seller to Buyer A transaction. However, the deed from Seller to Buyer A must be recorded prior to the deed from Buyer A to Buyer B. Finally, the lender's closing instructions often require that the closing agent verify that the property has not been conveyed within a certain time period prior to the closing and/or that there is no simultaneous conveyance of the property.

In the eight flip sales closed by respondent, the HUD–1 settlement statements and other closing documents did not disclose to the lenders that the properties were being transferred in two conveyances rather than one. Further, the HUD–1 settlement statements did not reveal that the loan proceeds were being used to fund the first conveyance. Respondent admits he failed to comply with the lenders' closing instructions in these transactions, but certified that he had complied with the instructions. Respondent represents he lacked the experience or training sufficient to recognize the transactions as fraudulent. He relied on the experience and expertise of his partners, the brokers, agents, and investment companies.

### Matter III

Mr. Heckle was the proprietor of Keystone. He was also affiliated with Kenbill. Mr. Heckle broke his ties with that company when its principals came under federal investigation for mortgage fraud. Respondent had ceased closing loans for Kenbill prior to that time.

Respondent subsequently entered into a joint venture with Mr. Heckle. Respondent intended to engage in real estate investment without defrauding lenders.

Respondent's agreement with Mr. Heckle provided that respondent would solicit investors to purchase homes built by

Mr. Smith. The borrower/investor would advance money that would be listed on the HUD–1 as cash from buyer (i.e., down payment). Respondent would rebate or kick back a portion of the sales proceeds to Mr. Heckle. Mr. Heckle was to retain one-third of the rebate as his fee, pay one-third of the rebate to respondent as his non-legal fee, and place the remaining one-third into a Keystone account. The Keystone account was to be used to manage the properties and pay the mortgage payments until rent was received. Once rent was received, the balance from the transaction in the Keystone account would be paid to borrowers/investors. The rent payments would be applied to the loan payment and management expenses and any profit would go to the borrowers/investors. Respondent believed this arrangement would be legal because the trust account disbursements would correspond with the HUD–1.

Respondent recruited members of his family and friends to make these real estate investments. In these transactions, Mr. Smith determined the minimum sales price he would accept for each property. Based on an inflated sales price and representation to the lender that the borrower would make a down payment, loans were obtained for more than Mr. Smith's sales price. Mr. Heckle and the borrower/investors would provide the down payment. Respondent or someone from his firm conducted the closings.

At the closings, the firm received the loan proceeds plus the "down payments." Trust account checks were then issued according to the HUD–1. Mr. Smith received a check in the amount listed on the HUD–1 as payable to the seller. Mr. Smith would then pay rebates (or kickbacks) to Keystone, to Mr. Heckle, and to the borrowers/investors.

At the time, respondent believed that, because the amount shown on the HUD–1 was the amount actually paid to the seller from the trust account, that the transactions were legal. Respondent now admits that, because he was aware that the seller made subsequent distributions to Keystone, Mr. Heckle, and the borrowers/investors, that those distributions should have been revealed to the lender. He further admits that he was aware that the sales prices listed on the HUD–1 statements were not the actual prices paid to the seller.

At the closing of several of these transactions, respondent began to have some concerns about Mr. Heckle when a $15,000 check to a borrower/investor from the Keystone account was returned for insufficient funds and when one of respondent's investors reported that a mortgage payment had not been made. Mr. Heckle explained the lack of funds by stating his wife, who had access to the Keystone account, had taken the funds.

After the check was returned for insufficient funds, respondent assumed control over the management of the funds using his own account. He required Mr. Heckle to make up the shortfalls in cash derived from subsequent transactions.

In connection with these transactions, owner occupancy affidavits that stated the borrowers/investors intended to occupy the properties as primary residences were signed, notarized, and submitted to the lenders. Respondent was aware that most of the borrowers/investors did not intend to live in the homes. Respondent incorrectly advised the borrowers/investors that they were only required to spend one night in their properties to render the owner occupancy affidavits truthful. Respondent based this advice on incorrect information he received from a lender not associated with any of the transactions.

Respondent ultimately discovered that Mr. Heckle was not managing or maintaining the properties or securing renters. Respondent then dissolved the joint venture with Mr. Heckle and took over management of the properties. He used his own funds to cover investors' losses. When he discovered that his understanding of the requirements for owner occupancy was incorrect, he assisted the borrowers/investors in notifying the lenders and submitting corrected affidavits.

Respondent's interest in these investments created a conflict of interest for respondent and his firm. Respondent failed to advise the lenders or the borrowers/investors of that conflict of interest, although the investors he recruited were made aware of his personal involvement with Keystone. Respondent failed to obtained informed consent to waivers of this conflict of interest in accordance with the requirements of the Rules of Professional Conduct.

Respondent never received any funds from the proceeds of the loans as had been promised by Mr. Heckle. He did not personally profit from any of the transactions other than the legal fees generated which were paid to the firm. Respondent has paid significant sums to correct his errors.

Respondent made a self-report to the ODC. ODC agrees respondent has fully cooperated in this investigation.

## *LAW*

Respondent admits his misconduct constitutes grounds for discipline under Rule 7, RLDE, Rule 413, SCACR, particularly Rule 7(a)(1) (it is ground for discipline for lawyer to violate Rules of Professional Conduct), Rule 7(a)(5) (it is ground for discipline for lawyer to engage in conduct tending to pollute the administration of justice or to bring legal profession into disrepute or to engage in conduct demonstrating an unfitness to practice law), and Rule 7(a)(6) (it is ground for discipline for lawyer to violate the oath of office taken upon admission to practice law in this state). In addition, respondent admits that, by his misconduct, he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.8 (lawyer shall not enter into a business transaction with a client or knowingly acquire a pecuniary interest adverse to a client unless transactions and terms are reasonable to the client and fully disclosed and submitted to client in writing and client consents in writing); Rule 4.1 (in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person); Rule 8.4(a) (it is professional misconduct for lawyer to violate the Rules of Professional Conduct); Rule 8.4(d) (it is professional misconduct for lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(e) (it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice).

We accept the second agreement and disbar respondent from the practice of law.

## CONCLUSION

We accept the two Agreements for Discipline by Consent. We impose a definite suspension of two years and disbar respondent from the practice of law. The sanctions shall run concurrently. Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

**DEFINITELY SUSPENDED AND DISBARRED.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.